No. 21-15414

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

DARIO GURROLA, FERNANDO HERRERA,
*Plaintiffs-Appellants,*

v.

DAVID DUNCAN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE CALIFORNIA
EMERGENCY MEDICAL SERVICES AUTHORITY; JEFFREY KEPPLE, IN HIS OFFICIAL
CAPACITY AS MEDICAL DIRECTOR OF NORTHERN CALIFORNIA EMS, INC.; TROY
FALCK,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the Eastern District of California, Case No. 2:20-cv-01238-JAM-DMC
The Honorable John A. Mendez, District Judge

**BRIEF OF *AMICI CURIAE* THE DKT LIBERTY PROJECT, THE CATO
INSTITUTE, COLLATERAL CONSEQUENCES RESOURCE CENTER,
CLAUSE 40 FOUNDATION, LAW ENFORCEMENT ACTION
PARTNERSHIP, THE MACARTHUR JUSTICE CENTER, THE R STREET
INSTITUTE, THE SENTENCING PROJECT, AND THE
NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

JESSICA RING AMUNSON
  *Counsel of Record*
CAROLINE C. CEASE
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001
(202) 639-6000
jamunson@jenner.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

CORPORATE DISCLOSURE STATEMENT ........................................... v

INTEREST OF *AMICI CURIAE* .............................................................. 1

SUMMARY OF ARGUMENT ................................................................. 5

ARGUMENT ........................................................................................... 6

I.     Collateral Consequences Laws In Licensing And Employment Often Are Untethered From The Underlying Job At Hand. ..................................... 6

II.    This Court Should Not Rubber Stamp California's Restrictions In The Name Of Rational Basis Review. ................................................................. 17

CONCLUSION ....................................................................................... 23

i

# TABLE OF AUTHORITIES

## CASES

*Barletta v. Rilling*, 973 F. Supp. 2d 132 (D. Conn. 2013) .................................19, 20

*Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999) ...............................................17

*Fields v. Department of Early Learning*, 434 P.3d 999 (Wash. 2019) ...................22

*Gregg v. Lawson*, 732 F. Supp. 849 (E.D. Tenn. 1989) .........................................19

*Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008) ...............................................17

*Pordum v. Board of Regents*, 491 F.2d 1281 (2d Cir. 1974) ...........................11, 18

*Rinaldi v. Yeager*, 384 U.S. 305 (1966) ...................................................................17

*Schweiker v. Wilson*, 450 U.S. 221 (1981) ..............................................................17

*Smith v. Fussenich*, 440 F. Supp. 1077 (D. Conn. 1977) .......................................19

## STATUTES

Cal. Code Regs. tit. 22, § 100214.3(c)(6) .................................................................21

Conn. Gen. Stat. § 46a-80(c) ....................................................................................10

D.C. Mun. Reg. tit. 19, § 1208...................................................................................9

Fla. Stat. § 403.413(6)(c) ..........................................................................................13

La. Rev. Stat. § 37:36(C) ...........................................................................................10

09-137 Me. Code R. § 20-4 .........................................................................................9

Mont. Code Ann. § 37-1-203 .....................................................................................10

N.D. Cent. Code § 43-36-10.1 .....................................................................................9

Nev. Rev. Stat. § 122.064(3)(c) ..................................................................................8

Okla. Admin. Code § 710:60-9-131(a) ....................................................................7, 8

63 Pa. Cons. Stat. § 510.3 .........................................................................................11

815 R.I. Code R. § 50-10-3.5(B)(2)...................................................8

R.I. Gen. Laws § 5-20-27...............................................................8

R.I. Gen. Laws § 11-35-17(a)........................................................14

R.I. Gen. Laws § 28-27-21.............................................................8

Tenn. Code Ann. § 69-10-105(a)(7)...............................................8

16 Tex. Admin. Code § 75.27........................................................8

Va. Code Ann. § 18.2-471.............................................................12

Va. Code Ann. § 47.1-4................................................................12

W. Va. Code § 30-22-10(a)........................................................7, 9

**OTHER AUTHORITIES**

Jared A. Brock, *As California Wildfires Raged, Incarcerated Exploited for Labor*, USA Today (Nov. 11, 2020), https://www.usatoday. com/story/opinion/policing/2020/11/11/california-wildfires-raged-incarcerated-exploited-labor-column/6249201002/ ...........................................21

Crimesider Staff, *Anthony Brasfield, Fla. Man, Charged After Releasing Balloons Into Sky, Report Says*, CBS News (Feb. 25, 2013), https://www.cbsnews.com/news/anthony-brasfield-fla-man-charged-after-releasing-balloons-into-sky-report-says/................................ 13-14

Le'Ann Duran et al., *Integrated Reentry and Employment Strategies: Reducing Recidivism and Promoting Job Readiness*, The Council of State Governments Justice Center (Sept. 2013), https://csgjustice center.org/wp-content/uploads/2020/02/Final.Reentry-and-Employ ment.pp_.pdf ...........................................................16

Adam Edelman, *Inmates Who Learn Trades are Often Blocked from Jobs. Now Something's Being Done.*, NBC News (May 26, 2018), https://www.nbcnews.com/politics/politics-news/inmates-who-lear n-trades-are-often-blocked-jobs-now-something-n877666................................15

Alec C. Ewald, *Barbers, Caregivers, and the 'Disciplinary Subject': Occupational Licensure for People with Criminal Justice Backgrounds in the United States*, 46 Fordham Urb. L.J. 719 (2019) ........................................................................................... 10, 15

Emily Fetsch, *No Bars: Unlocking the Economic Power of the Formerly Incarcerated*, Ewing Marion Kauffman Foundation (Nov. 2016) ...................................................................................... 10, 16

Clyde Haberman, *Only at Grave Does Barber Get a Break*, N.Y. Times (Nov. 22, 2005), https://www.nytimes.com/2005/11/22/nyregion/only-at-grave-does-barber-get-a-break.html .................................... 15

Jonathan Haggerty, *How Occupational Licensing Laws Harm Public Safety and the Formerly Incarcerated*, R Street Policy Study No. 143 (May 2018), https://www.rstreet.org/wp-content/uploads/2018/05/Final-No.-143-for-posting.pdf ........................................ 13

Bryant Jackson-Green, *How Occupational Licensing Blocks Path to Success for Ex-Offenders*, Illinois Policy (Apr. 7, 2015), https://www.illinoispolicy.org/how-occupational-licensing-blocks-path-to-success-for-ex-offenders/ .......................................................... 9, 13

*Jobs for Californians: Strategies to Ease Occupational Licensing Barriers*, Report #234, Little Hoover Commission (Oct. 2016), https://lhc.ca.gov/sites/lhc.ca.gov/files/Reports/234/Report234.pdf ................... 6

Tyler Kingkade, *Critics Say "Oppressive" Pennsylvania Law Requires Cosmetologists Be A Good Person*, Today (June 22, 2020), https://www.today.com/style/critics-say-oppressive-pennsylvania-law-requires-cosmetologists-be-good-person-t184901 ............................... 12

John G. Malcolm & John-Michael Seibler, *Collateral Consequences: Protecting Public Safety or Encouraging Recidivism?*, Heritage Foundation (Mar. 7, 2017), https://www.heritage.org/sites/default/files/2017-03/LM-200.pdf .............................. 12-13

Chidi Umez & Rebecca Pirius, *Barriers to Work: Improving Employment in Licensed Occupations for Individuals with Criminal Records*, National Conference of State Legislatures (2018), http://www.ncsl.org/Portals/1/Documents/Labor/Licensing/criminalRecords_v06_web.pdf ....................................................... 6, 7

iv

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* state that they do not have any parent corporations, and that no publicly held corporation owns a 10% or more ownership interest in any *amicus curiae*.

## INTEREST OF *AMICI CURIAE*[1]

**The DKT Liberty Project** was founded in 1997 to promote individual liberty against encroachment by all levels of government. The Liberty Project is committed to defending privacy, guarding against government overreach, and protecting every American's right and responsibility to function as an autonomous and independent individual. The Liberty Project espouses vigilance over government overreach of all kinds, but especially overreach that restricts individual civil liberties. The Liberty Project has filed several briefs as *amicus curiae* with state and federal courts and with the United States Supreme Court on issues involving constitutional rights and civil liberties.

**The Cato Institute** is a non-partisan public-policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. The Cato Institute's Project on Criminal Justice was founded in 1999 and focuses on the proper role of the criminal sanction in a free society, the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory

---

[1] *Amici curiae* hereby certify that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than *amici curiae* and their counsel contributed money intended to fund the preparation or submission of this brief.

1

safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

**The Collateral Consequences Resource Center** ("CCRC") is a non-profit organization established in 2014 to promote public discussion regarding the collateral consequences of arrest and conviction—that is, the laws and policies that restrict opportunities for people with a criminal record even after their court-imposed sentence has been completed. CCRC takes a national perspective on this dynamic area of law and social policy, and its Restoration of Rights Project collects and analyzes mechanisms for obtaining relief from collateral consequences in every state, including alleviation of restrictions on occupational licensure. CCRC has a particular interest in removing mandatory bars to public employment and licensure based solely on a criminal conviction.

**Clause 40 Foundation** is a non-partisan non-profit organization whose mission is to honor and promote the due process rights guaranteed in the U.S. Constitution. The promise of due process that America's legal system is based upon was first documented in the 13th Century in Clause 40 of Magna Carta: *To no one will we sell, to no one deny or delay, right or justice.* This promise is as relevant today as it ever was—including as applied to the tens of thousands of occupational licensing requirements that irrationally prevent millions of Americans who have a criminal conviction from pursuing economic liberty.

**The Law Enforcement Action Partnership** is a 501(c)(3) non-profit of police, prosecutors, judges, corrections officials, and other law enforcement professionals who advocate for drug policy and criminal justice reforms that will make communities safer by focusing law enforcement resources on the greatest threats to public safety, promoting alternatives to arrest and incarceration, addressing the root causes of crime, and working toward healing police-community relations.

**The MacArthur Justice Center** ("MJC") is a not-for-profit organization founded by the family of J. Roderick MacArthur to advocate for civil rights and a fair and humane criminal justice system. MJC has an interest in the sound and fair administration of the criminal justice system, including issues concerning the treatment of people who are incarcerated and the formerly-incarcerated, and regularly litigates these issues in state and federal courts.

**The R Street Institute** is a non-profit, non-partisan, public-policy research organization. R Street's mission is to engage in policy research and educational outreach that promotes free markets, as well as limited yet effective government, including properly calibrated legal and regulatory frameworks that support economic growth and individual liberty.

**The Sentencing Project** ("TSP") is a national nonprofit organization established in 1986 to engage in public policy research, advocacy and education on criminal justice reform. TSP promotes effective and humane responses to crime that

3

minimize imprisonment and criminalization of youth and adults by promoting racial, ethnic, economic and gender justice. TSP's policy priorities envision the full inclusion in society of people with criminal records and an end to extreme punishments. Through research, education, and advocacy, TSP analyzes the effects of sentencing and incarceration policies, including their impact on the reintegration of those convicted of a crime into civil society.

**The National Association of Criminal Defense Lawyers** ("NACDL") is a non-profit voluntary professional bar association that works on behalf of criminal defense attorneys to ensure justice and due process for those accused of crime or misconduct. NACDL was founded in 1958. It has a nationwide membership of many thousands of direct members, and up to 40,000 with affiliates. NACDL's members include private criminal defense lawyers, public defenders, military defense counsel, law professors, and judges. NACDL is the only nationwide professional bar association for public defenders and private criminal defense lawyers. NACDL is dedicated to advancing the proper, efficient, and just administration of justice. NACDL files numerous amicus briefs each year in the U.S. Supreme Court and other federal and state courts, seeking to provide amicus assistance in cases that present issues of broad importance to criminal defendants, criminal defense lawyers, and the criminal justice system as a whole. NACDL has

a particular interest in the collateral consequences of criminal convictions for individuals who are seeking employment.

## SUMMARY OF ARGUMENT

State licensing schemes that categorically bar individuals with prior criminal convictions from holding various professions are irrational. Across the country, these licensing schemes cover almost every profession imaginable. However, these regulations frequently do nothing other than bar those with criminal records from entering a profession. These regulations prevent those with felony convictions from, among other things, operating a taxi cab, performing marriages, and working as a tag officer at a state department of motor vehicles. This is true regardless of whether the individual has been convicted of a major fraud, a violent crime, or something as minor as felony littering. States regularly impose criminal-history restrictions on occupational licenses that are entirely unrelated to the applicant's fitness to be a contributing member to the profession. And these restrictions—which bar individuals with prior convictions from finding gainful employment—contribute to recidivism, further underscoring their irrationality.

Although courts have held that these licensing schemes are subject to only rational basis review, rational basis is not a toothless standard; it requires that a court find some logical relationship between the restriction—here, two felony convictions—and the occupation being regulated—here, emergency medical

technicians ("EMTs"). Courts historically have been critical of, and have struck down under this test, broad regulatory schemes that bar membership of an applicant who has *any* felony conviction. Because California's regulatory scheme bars individuals convicted of any two felonies without regard for whether the crimes at issue implicate the applicant's fitness to become an EMT, including to fight fires, this scheme likewise fails rational basis review. As a result, this Court should vacate the district court's order granting the defendants' motion to dismiss and remand this case for further proceedings.

## ARGUMENT

I. **Collateral Consequences Laws In Licensing And Employment Often Are Untethered From The Underlying Job At Hand.**

As of 2018, approximately one in three adults had a criminal record, and an estimated 600,000 inmates are released each year. *See* Chidi Umez & Rebecca Pirius, *Barriers to Work: Improving Employment in Licensed Occupations for Individuals with Criminal Records*, National Conference of State Legislatures, at 1-2 (2018). In California alone, for example, over 18,000 inmates were paroled and an additional 29,000 others were released to post-release community supervision in 2012. *See Jobs for Californians: Strategies to Ease Occupational Licensing Barriers*, Report #234, Little Hoover Commission, at 27 (Oct. 2016).

Each of these individuals, when released, is potentially subject to "over 15,000 provisions of law in both statute and regulatory codes that limit occupational

licensing opportunities for individuals with criminal records." Umez & Pirius, *Barriers to Work: Improving Employment in Licensed Occupations for Individuals with Criminal Records* at 1. These laws may come in the form of mandatory blanket disqualifications, automatically prohibiting an individual who has committed, for example, any felony, from obtaining a professional license. *See id.*; *see also, e.g.*, Okla. Admin. Code § 710:60-9-131(a) (providing that an applicant for a "motor license agent" qualification is not eligible if she has been convicted of a felony). Many other laws take the form of requiring the licensing authority to determine— without providing any guidance—whether the applicant's conviction implicated her moral character; if so, a license must be denied. *See* Umez & Pirius, *Barriers to Work: Improving Employment in Licensed Occupations for Individuals with Criminal Records* at 1; *see also, e.g.*, W. Va. Code § 30-22-10(a) (prohibiting a landscape architect license to any applicant "convicted of a crime involving moral turpitude").

While perhaps *some* of these thousands of restrictions are limited in scope— anchoring the specific conviction to the specific job at issue—many appear to bear no relationship whatsoever to the profession being regulated. Examples abound. In Rhode Island, a license to operate a taxi *must* be denied if the applicant has been convicted of a misdemeanor within the previous year, convicted of more than one misdemeanor in the previous five years, or convicted of any felony within the

previous ten years. *See* 815 R.I. Code R. § 50-10-3.5(B)(2). Also in Rhode Island, if a pipefitter, refrigeration worker, air conditioning worker, or sheet metal worker commits any felony, that person's license to conduct that work may be revoked or suspended. *See* R.I. Gen. Laws § 28-27-21. The same is true of plumbers, whose licenses "shall [be] revoke[d]" if the licensee "is convicted of a felony." R.I. Gen. Laws § 5-20-27.

In Nevada, including Las Vegas, an individual convicted of a felony or released from confinement or completed probation, whichever is later, in the prior ten years *must* be denied a certificate to perform marriages. Nev. Rev. Stat. § 122.064(3)(c). And in Oklahoma, one convicted of a felony is ineligible for the position of "motor license agent," and therefore cannot work in the state's motor vehicle agencies. *See* Okla. Admin. Code § 710:60-9-131(a) ("The applicant must not have been convicted of a felony and/or no felony charges may be pending against the applicant."). In Tennessee, a license to conduct well drilling and installation may be denied, suspended, or revoked if the applicant has a felony conviction. Tenn. Code Ann. § 69-10-105(a)(7). And in Texas, an air conditioning technician applicant's temporary registration will automatically be denied if the applicant has been convicted of any criminal offense or been placed on deferred adjudication. *See* 16 Tex. Admin. Code § 75.27. In addition, one with a felony conviction seeking employment in Illinois may be barred from receiving a license to work as, among

other things, a land surveyor, a geologist, a nail technician, a barber, or a pet shop operator. *See* Bryant Jackson-Green, *How Occupational Licensing Blocks Path to Success for Ex-Offenders*, Illinois Policy (Apr. 7, 2015).

Occupational licensing regulations span almost every industry imaginable—from landscape architect to taxidermist. *See, e.g.*, W. Va. Code § 30-22-10(a) (barring an applicant for a landscape architect license from approval if the applicant has "been convicted of a crime involving moral turpitude"); 09-137 Me. Code R. § 20-4 (providing that certain convictions render an applicant ineligible for a taxidermy license in Maine); N.D. Cent. Code § 43-36-10.1 (providing circumstances under which a conviction will disqualify an applicant from serving "as a professional soil classifier"); D.C. Mun. Reg. tit. 19, § 1208 (setting out circumstances, including various convictions, that may disqualify an applicant from receiving a sightseeing tour guide license in Washington, D.C.).

While it is difficult to imagine how most, if not all, criminal convictions could reasonably relate to one's fitness to engage in taxidermy or become a professional soil classifier, states across the country continue to impose additional hurdles (or outright bars) on those with criminal convictions wishing to engage in professions such as these. And most do so with no attempt whatsoever to link the crime of conviction to a lack of fitness to perform the relevant profession. Indeed, as of 2016, twenty-nine states had "no standards governing the relevance of conviction records

9

of applicants for occupational licenses." Emily Fetsch, *No Bars: Unlocking the Economic Power of the Formerly Incarcerated*, Ewing Marion Kauffman Foundation, at 7 (Nov. 2016) (quotation marks omitted). Thus, "[t]here is a consensus that state occupational-credential restrictions . . . typically impose blanket restrictions . . . with no attention to the individual circumstances or qualifications of the applicant in question." Alec C. Ewald, *Barbers, Caregivers, and the 'Disciplinary Subject': Occupational Licensure for People with Criminal Justice Backgrounds in the United States*, 46 Fordham Urb. L.J. 719, 722 (2019) (internal quotation marks and bracket omitted).

Notably, some states have begun requiring licensing bodies to determine whether the crime of conviction relates to the qualifications of the job for which the license is being sought, or limiting denials to convictions that implicate the applicant's "good moral character." *See, e.g.*, Conn. Gen. Stat. § 46a-80(c) (requiring that a license may be denied for a prior conviction if "the applicant is not suitable for . . . the specific occupation, trade, vocation, profession or business" after considering "the nature of the crime and its relationship to the job for which the person has applied"); La. Rev. Stat. § 37:36(C) ("A licensing entity shall not be required to issue a [provisional] license to an applicant whose conviction directly relates to . . . the specific field for which the license is required, or profession for which the [provisional] license is sought."); Mont. Code Ann. § 37-1-203 ("[W]here

10

a license applicant has been convicted of a criminal offense and such criminal offense relates to the public health, welfare, and safety as it applies to the occupation for which the license is sought, the licensing agency may, after investigation, find that the applicant so convicted has not been sufficiently rehabilitated as to warrant the public trust and deny the issuance of a license."); 63 Pa. Cons. Stat. § 510.3 (requiring that an applicant "establish[ ] to the satisfaction of the board that he or she is of good moral character").

However, many of these states offer little to no guidance about how to apply these standards to determine whether the crime of conviction has any actual relation to the job for which the license is sought. And licensing bodies—frequently, if not always, made up of members of the very profession being licensed—may be incentivized to deny individuals with prior convictions from joining the profession: "[W]hen faced with the problem of whether to license persons with criminal records, [licensing bodies] may be unduly concerned with the effect on the status of their professions." *Pordum v. Bd. of Regents*, 491 F.2d 1281, 1287 n.14 (2d Cir. 1974) (quotation marks omitted). Not only that, "to the extent [that licensing bodies] try to consider the public interest, they are likely to have an unrealistic view of the importance of their own profession or occupation and the potential harm to the public that might be done by unfit persons." *Id.* (quotation marks omitted). Even where the letter of the law requires some connection between the applicant's ability to the

11

qualifications needed or to the applicant's current "moral character," licensing bodies have the discretion—and misaligned incentive—to be overly critical of any conviction on an applicant's record.[2]

In some states, it is nearly impossible to find employment in any regulated profession following a criminal conviction. Virginia alone, as of 2017, had in effect over 140 mandatory collateral consequences regulations impacting employment, ranging from disqualifying certain individuals who committed a misdemeanor from holding any state "office of honor, profit, or trust," *see* Va. Code Ann. § 18.2-471, all the way to rendering persons convicted of a felony ineligible to hold a commission as a notary public, *see* Va. Code Ann. § 47.1-4. Ohio likewise has hundreds of mandatory collateral consequences regulations, including, in addition to those noted above, restrictions on licensing for truck drivers and contractors. *See generally*, John G. Malcolm & John-Michael Seibler, *Collateral Consequences: Protecting Public Safety or Encouraging Recidivism?*, Heritage Foundation (Mar. 7,

---

[2] This has been borne out in practice. For example, Courtney Haveman was unable to demonstrate to the satisfaction of Pennsylvania's regulators that she was of "good moral character" and thus fit to become a cosmetologist despite the fact that she had been sober for six years after alcohol and marijuana-related convictions more than five years prior. *See* Tyler Kingkade, *Critics Say "Oppressive" Pennsylvania Law Requires Cosmetologists Be A Good Person*, Today (June 22, 2020); *see also id.* (describing the story of Amanda Spillane, also rejected by the cosmetology licensing board because of prior drug convictions, who asked "[h]ow do you prove your moral character anyway? It's hard, besides just doing the right thing and not getting in trouble anymore.").

2017).  Overall, across the country, two out of every five workers need some form of government license—federal, state, local, or some combination of the three—to do their jobs.  *See* Jackson-Green, *How Occupational Licensing Blocks Path to Success for Ex-Offenders*.  In states with collateral consequences restrictions, this vastly narrows the range of potential employment options for those with criminal convictions.

Unfortunately, the number of these statutory and regulatory requirements prohibiting those convicted of certain offenses from entering various professions continues to increase.  *See* Jonathan Haggerty, *How Occupational Licensing Laws Harm Public Safety and the Formerly Incarcerated*, R Street Policy Study No. 143, at 2 (May 2018) (noting that "occupational licensing laws have exploded in recent years to cover a large number of benign career fields").  Yet many of these regulations are entirely unrelated to the ability to safely and successfully practice the licensed profession, particularly where, as here, an applicant is deemed unqualified if he has been convicted of *any* felony or, in some instances *any* misdemeanor. Felony crimes include a very wide array of activity—from intentional murder to littering, which may or may not be relevant to an applicant's fitness to perform various professions.  *See, e.g.*, Fla. Stat. § 403.413(6)(c) (providing that certain littering activity can amount to "a felony of the third degree"); Crimesider Staff, *Anthony Brasfield, Fla. Man, Charged After Releasing Balloons Into Sky, Report*

13

*Says*, CBS News (Feb. 25, 2013) (reporting on a Florida man who was charged with a felony after "releasing a dozen heart-shaped balloons into the sky").[3] That some occupational licensing schemes bar applicants convicted of *any* felony crime in the United States (be it murder or fraud or littering) demonstrates just how untethered the past underlying criminal conduct can be from the occupation for which the license is sought.

The irrationality of these schemes is patently manifest. For example, an individual in Rhode Island can be convicted of a misdemeanor for making prank phone calls. *See* R.I. Gen. Laws § 11-35-17(a). That individual would then be barred from receiving a license to operate a taxi cab for at least a year. Meanwhile, a convicted Florida litterer can find himself barred from working as an agent in an Oklahoma vehicle tag office, and will be deemed not qualified to perform marriages in Nevada. It is difficult, if not downright impossible, to conjure any rationale that would explain how a decision to make prank calls would implicate an applicant's ability to safely and adequately operate a taxi cab. Likewise, littering has absolutely no connection to one's fitness to work as a tag agent for a state motor vehicle department, much less perform marriages for happy couples in Las Vegas. And yet, the prank caller and the litterer may well find themselves barred from receiving a

---

[3] *Available at* https://www.cbsnews.com/news/anthony-brasfield-fla-man-charged-after-releasing-balloons-into-sky-report-says/.

license to engage in those professions, despite their underlying conduct having no relation to their fitness to carry out those jobs.

Perhaps most egregious, many individuals learn a trade while incarcerated only to find out, upon re-entering society, that their conviction renders them unqualified to receive a license to practice that trade. Adam Edelman, *Inmates Who Learn Trades are Often Blocked from Jobs. Now Something's Being Done.*, NBC News (May 26, 2018).[4] As an example, barbering, which is often taught in prison, historically has been "one of the most restricted occupations." Ewald, *Barbers, Caregivers, and the 'Disciplinary Subject'*, 46 Fordham Urb. L.J. at 733 (James W. Hunt et al., *Laws, Licenses and the Offender's Right to Work: A Study of State Laws Restricting the Occupational Licensing of Former Offenders* 9 (1973))). Indeed, all fifty states, in some form or another, "restrict former offenders from employment as barbers (even though many prisons provide training programs in barbering)." *Id.* (quoting Todd R. Clear et al., *American Corrections* 453 (9th ed. 2011).[5] Thus, those who train in prison as barbers, cosmetologists, firefighters, construction

---

[4] *Available at* https://www.nbcnews.com/politics/politics-news/inmates-who-learn-trades-are-often-blocked-jobs-now-something-n877666.

[5] Take, for example, the story of Marc LaCloche, who learned to cut hair in a New York prison but, upon his release, was denied a barbering license because he was determined—due to his conviction—to lack the "good moral character" needed to receive the license at the time he applied for it. *See* Clyde Haberman, *Only at Grave Does Barber Get a Break*, N.Y. Times (Nov. 22, 2005).

workers, or aestheticians may find themselves barred by state licensing restrictions from putting to use the very skills they learned while incarcerated.

The costs of unemployment for those with criminal convictions are not limited to lack of income. Rather, "[e]mployment can make a strong contribution to recidivism-reduction efforts because it refocuses individuals' time and efforts on prosocial activities, making them less likely to engage in riskier behaviors and to associate with people who do." Le'Ann Duran et al., *Integrated Reentry and Employment Strategies: Reducing Recidivism and Promoting Job Readiness* at 2, The Council of State Governments Justice Center (Sept. 2013). Specifically, research has indicated that "employment plays an important role in encouraging rehabilitation and reducing recidivism." Fetsch, *No Bars: Unlocking the Economic Power of the Formerly Incarcerated* at 9. One study "found that formerly incarcerated people who are employed a year after release can have a recidivism rate as low as 16 percent—compared to the 48 percent of all formerly incarcerated people who return to prison within three years." *Id.* (internal quotation marks and footnote omitted). Thus, "[d]enying licenses to those with criminal records to protect the public might actually lead to an increase in crime." *Id.*

Needlessly and irrationally creating barriers through the use of licensing schemes that prevent those with a criminal record from entering professions not only makes little sense, it also has a tangible public harm. Those unable to enter a

16

profession, including those that may have been trained in a particular profession while incarcerated, are statistically more likely to reoffend simply because they are unable to find employment for which they are qualified.

## II. This Court Should Not Rubber Stamp California's Restrictions In The Name Of Rational Basis Review.

This Court has acknowledged and applied "the fundamental principle that '[r]egulations on entry into a profession, as a general matter, are constitutional'" only "'if they have a rational connection with the applicant's fitness or capacity to practice the profession.'" *Dittman v. California*, 191 F.3d 1020, 1030 (9th Cir. 1999) (alteration in original) (quoting *Lowe v. SEC*, 472 U.S. 181, 228 (1985) (White, J., concurring) (internal quotation marks omitted)). While this rational basis test is a deferential one, it does not permit courts to rubber stamp a law without finding a rational connection between the regulation at issue and the profession being regulated. *See Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) ("[W]hile a government need not provide a perfectly logical[ ] solution to regulatory problems, it cannot hope to survive *rational* basis review by resorting to irrationality.").

Indeed, the standard is "not a toothless one," *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (quotation marks omitted), and requires "some rationality in the nature of the class singled out," *Rinaldi v. Yeager*, 384 U.S. 305, 308-09 (1966). When confronted with occupational licensing bars that apply to entire groups of people, as is the case here, courts must ensure that applying the rational basis

17

standard involves more than simply a decision to wholesale bar people with felony convictions—regardless of the crime of conviction and whether that crime bears any relation to the profession—from obtaining an occupational license.

Courts for decades have voiced concern over these types of broad regulations on licensing, particularly those targeting all felony convictions. For example, the Second Circuit, in 1974, noted that these types of regulations can be "at odds with modern correctional theory" and "bar[ ] persons with criminal records from many employment opportunities." *Pordum*, 491 F.2d at 1287 n.14. As the Second Circuit observed: "These barriers to employment appear to be a major contributor to the high rate of recidivism which plagues society." *Id.* That court also quoted at length a 1967 Task Force Report issued by the President's Commission on Law Enforcement and Administration of Justice, which described licensing bodies as "primarily concerned with advancing the interests of their own members" such that "when faced with the problem of whether to license persons with criminal records, they may be unduly concerned with the effect on the status of their professions." *Id.* The Task Force Report also noted that to the extent licensing bodies "try to consider the public interest, they are likely to have an unrealistic view of the importance of their own profession or occupation and the potential harm to the public that might be done by unfit persons." *Id.*

18

The Second Circuit is not the lone court to have expressed these concerns about occupational licensing schemes targeting those with criminal records. The District of Connecticut in 1977 concluded that a statute barring anyone with a felony conviction from employment with licensed private detective and security agencies failed rational basis review. *Smith v. Fussenich*, 440 F. Supp. 1077 (D. Conn. 1977); *see also id.* at 1080 ("The legislation fails to recognize the obvious differences in the fitness and character of those persons with felony records. Felony crimes such as bigamy and income tax evasion have virtually no relevance to an individual's performance as a private detective or security guard.").

A little over ten years later, the Eastern District of Tennessee similarly found that a law requiring removal from the state's call list for car towing services of individuals convicted of any felony failed the rational basis test. *See Gregg v. Lawson*, 732 F. Supp. 849, 854-55 (E.D. Tenn. 1989) ("The Court could understand how a conviction for theft, fraud, the sale or distribution of narcotics, burglary, or similar crimes of dishonesty might rationally be considered a disqualification, but how every felony conviction, regardless of the circumstances or the nature of the crime, disqualifies a person from providing wrecker services to the State is not clear to the Court."). And courts more recently likewise have reached similar conclusions. *See, e.g.*, *Barletta v. Rilling*, 973 F. Supp. 2d 132 (D. Conn. 2013) (holding that categorical disqualification of all individuals who have been convicted of a felony

19

from receiving a license to trade in precious metals failed the rational basis test); *see also id.* at 138 ("A rational nexus between a conviction for any and every felony offense and the fitness to act as a precious metals dealer simply does not exist.").

As detailed above with respect to the current regulatory landscape, the concerns that were raised in the 1960s and 1970s are just as valid now as they were then. And those same concerns—and the exponential growth of these licensing requirements over the years—should cause this Court to be skeptical of those requirements when conducting the rational basis analysis. To the extent each of the myriad professions currently requiring a license needs a licensing scheme at all, it is unclear how almost any felony crime can bear on an individual's fitness to safely and competently carry out many of the jobs for which a license is required.

California's regulation barring persons convicted of two or more felonies, as well as those who have been convicted and released from incarceration within ten years for any offense punishable as a felony, implicates these exact same concerns, and for the same reasons fails rational basis review. Specifically, California's regulation draws *no* distinction beyond the classification of felony conviction and fails to recognize the differences in various felony crimes that may have some relevance to the EMT profession and those that have no relation whatsoever to the occupation. As one example of the latter, the Florida litterer who, perhaps, released balloons into the air, would be required to wait ten years before being able to obtain

an EMT certification in California. *See* Cal. Code Regs. tit. 22, § 100214.3(c)(6) (mandating the denial of an application for an EMT certificate if the applicant has "been convicted and released from incarceration for said offense during the preceding ten (10) years for any offense punishable as a felony").

California's EMT licensing scheme—barring all felons within a ten year period, and all individuals convicted of two or more felonies from eligibility—simply is far too broad to bear any rational connection with an applicant's fitness or capacity to perform the job. And, indeed, California appears to acknowledge this point: The state not only trains inmates with felony convictions in firefighting, the state has *relied* on inmates with felony convictions to fight wildfires for decades. *See* Jared A. Brock, *As California Wildfires Raged, Incarcerated Exploited for Labor*, USA Today (Nov. 11, 2020)[6] (noting that California's "inmate firefighter program can be traced back to 1915"). It is difficult to understand what rational basis the state could have for barring individuals with any felony conviction from securing post-conviction employment as a firefighter when the state relies on incarcerated individuals to do the same work when the need arises.

While rational basis review is a deferential standard, it is not without some force. Given the history of lawmakers imposing broad categorical bans on those

---

[6] *Available at* https://www.usatoday.com/story/opinion/policing/2020/11/11/california-wildfires-raged-incarcerated-exploited-labor-column/6249201002/.

with a criminal record when it comes to occupational licensing, and given—as courts around this nation have discussed—these licensing schemes frequently lack any rational relation to applicant's fitness to safely and successfully perform the job at issue, this Court should be skeptical of the California scheme at issue here. As is the case with other licensing schemes that have been invalidated around the country, because California's EMT licensing scheme fails to take into account the fitness of persons with felony records for the specific profession at issue, it cannot withstand even rational basis review.[7]

---

[7] In addition, the district court failed to address Plaintiffs' as-applied challenge to California's EMT licensing scheme, depriving them of any opportunity for individualized review. *See* Appellants' Op. Br. 49-53; *see also Fields v. Dep't of Early Learning*, 434 P.3d 999 (Wash. 2019) (holding that a permanent licensing ban based on conviction history violates federal due process as applied to the plaintiff).

## CONCLUSION

For the foregoing reasons, *amici curiae* respectfully urge this Court to vacate the district court's order granting the defendants' motion to dismiss and remand the case for further proceedings.

Dated: May 18, 2021

Respectfully submitted,

/s/ Jessica Ring Amunson

JESSICA RING AMUNSON
CAROLINE C. CEASE
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001
(202) 639-6000
jamunson@jenner.com

*Counsel for Amici Curiae*

23

# CERTIFICATES

Jessica Ring Amunson, counsel for *amici curiae* (The DKT Liberty Project, et al.), hereby certifies that:

1.     I am a member in good standing of the Bar of the United States Court of Appeals for the Ninth Circuit.

2.     On this date, the foregoing Brief of *Amici Curiae* was filed electronically and served on the other parties via the Court's ECF system.

Dated: May 18, 2021                /s/ Jessica Ring Amunson

                                                    *Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 21-15414

I am the attorney or self-represented party.

**This brief contains** | 5,204 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated      .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jessica Ring Amunson    **Date** | May 18, 2021

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                  *Rev. 12/01/2018*